# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2197

_____

| | | |
|---|---|---|
| Bryan S. Behrens, | * | |
| | * | |
| Plaintiff/Appellant, | * | |
| | * | |
| Thomas D. Stalnaker, as the Receiver | * | |
| of Bryan S. Behrens, | * | |
| | * | |
| Intervenor Plaintiff, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Arch Insurance Company, | * | |
| | * | |
| Defendant/Appellee. | * | |
| | * | |
| _____ | * | |
| | * | |
| Arch Insurance Company, | * | |
| | * | |
| Counter Claimant/Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Bryan S. Behrens, | * | |
| | * | |
| Counter Defendant/Appellant, | * | |
| | * | |
| Thomas D. Stalnaker, | * | |
| | * | |
| Counter Defendant. | * | |

_____

Submitted: December 16, 2010
Filed: February 7, 2011
_____

Before WOLLMAN, BRIGHT, and COLLOTON, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Bryan Behrens appeals from a grant of summary judgment by the district court[1] in favor of Arch Insurance Company ("Arch"). Behrens's complaint requested a declaration that Arch has a duty to defend him under its errors & omissions policy and sought damages for breach of contract. The district court granted summary judgment for Arch. We affirm.

I.

Behrens was a registered representative of Sunset Financial Services, Inc. ("Sunset"), a broker-dealer subsidiary of Kansas City Life Insurance Company, Inc. ("KCL"), from May 17, 2000, until December 20, 2007. During this time, Behrens was the President and CEO of 21st Century Financial Group, Inc. ("21st Century"), a financial planning and insurance firm that also operated as a branch office for Sunset. Behrens also operated a separate entity, National Investments, Inc. ("National").

Arch issued Behrens an errors & omissions policy that provided coverage to Behrens for his activities performed as a representative for KCL and Sunset. Pursuant

_____

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

-2-

to a policy provision, the coverage period of June 1, 2007, to June 1, 2008, ended early on December 20, 2007, the date that Sunset terminated Behrens's agent contract. Generally, the policy applies only to claims first made against Behrens and reported by him to Arch during the policy period. An extended reporting period applies, however, when a policy period ends prematurely due to termination of the agent contract. This extended reporting period provides coverage for claims arising out of a wrongful act committed during the policy period, if Behrens gives written notice of such a claim within ninety days of termination of his agent contract.

On February 8, 2008, during this extended reporting period, Behrens gave Arch written notice of a complaint filed against him by the Securities and Exchange Commission ("SEC") and future anticipated related claims. The SEC complaint contains allegations that Behrens engaged in a Ponzi-like scheme from at least 2002 through December 2007, misappropriating more than $3.5 million of investor funds for his personal use. The complaint further alleges that Behrens perpetrated this scheme by soliciting investors from 21st Century, his firm that operated as a branch office of Sunset, and then offering and selling the investors notes through his separate entity, National. The complaint asserts that through this scheme, Behrens had violated the Securities Exchange Act of 1934 and the Securities Act of 1933. The SEC sought an injunction against future violations of federal securities laws, a prohibition on Behrens accepting funds from investors, a freeze on Behrens's assets, an accounting, disgorgement of all ill-gotten gains, and civil fines and penalties. In a letter dated February 27, 2008, Arch disclaimed coverage for this action.

Beginning on July 28, 2008, individual investors brought six lawsuits and one arbitration action against Behrens, asserting liability for the same conduct that formed the basis of the SEC action. After the filings, Behrens notified Arch of the investors' actions and sought defense costs under its policy. Arch denied any obligation to pay such costs. Following this denial, Behrens filed suit on December 4, 2008, invoking federal diversity jurisdiction under 28 U.S.C. § 1332. Arch filed a counterclaim,

seeking a declaratory judgment that it did not have a duty to defend the investors' actions.

Arch also filed a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), claiming entitlement to judgment as a matter of law because Behrens did not give notice of a "claim" as defined by the policy during the applicable reporting period. The district court denied the motion, concluding that the SEC complaint was a "claim" under the policy, and that the investors' claims potentially related back to notification of the SEC action.

Behrens later moved for summary judgment. The district court determined that Behrens's actions were not professional services as defined by the policy, and thus were not even potentially within the scope of coverage. Based on this conclusion, the court asked Behrens to show cause why his complaint should not be dismissed in its entirety. After further briefing, the court determined that there were no genuine issues of material fact with respect to the duty to defend, and granted summary judgment in favor of Arch.

Behrens appeals, arguing that the district court erred in granting summary judgment. Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). We review the district court's interpretation of provisions in an insurance contract and its decision to grant summary judgment *de novo*. *Transcon. Ins. Co. v. W.G. Samuels Co.*, 370 F.3d 755, 757 (8th Cir. 2004).

II.

The parties do not dispute that Nebraska law applies to this action. Under Nebraska law, insurance contracts should be construed to give effect to the parties'

intentions, and courts should apply the plain and ordinary meaning to unambiguous policy language. *Peterson v. Ohio Cas. Grp.*, 724 N.W.2d 765, 773 (Neb. 2006). Terms and phrases must be viewed in context, and policy language is considered ambiguous only when it is susceptible to two reasonable but conflicting meanings. *Poulton v. State Farm Fire & Cas. Cos.*, 675 N.W.2d 665, 672-73 (Neb. 2004). If an ambiguity exists, the policy should be construed in favor of the insured. *Id.* at 673.

An insurer's duty to defend is separate from, and broader than, the duty to indemnify. *Peterson*, 724 N.W.2d at 773. In determining its duty to defend, an insurer should first look to the allegations of the complaint against the insured. *Id.* An insurer "must also investigate and ascertain the relevant facts from all available sources." *Id.* Nebraska law requires an insurer to defend if "(1) the allegations of the complaint, if true, would obligate the insurer to indemnify, or (2) a reasonable investigation of the actual facts by the insurer would or does disclose facts that would obligate the insurer to indemnify." *Mortg. Express, Inc. v. Tudor Ins. Co.*, 771 N.W.2d 137, 147 (Neb. 2009). If the suit is based on a claim that is outside the coverage of the policy, however, then the insurer need not defend. *Id.* at 148. If the insurer invokes an exclusionary clause in a policy, then it bears the burden to prove that the exclusion applies. *Peterson*, 724 N.W.2d at 774.

We will assume for the sake of analysis that the SEC complaint qualifies as a "claim" under the policy and turn to the question whether Arch had a duty to defend Behrens based on that asserted claim. The policy insures Behrens for "all loss" that he becomes legally obligated to pay because of a "wrongful act" committed "solely in the rendering or failing to render Professional Services." The policy defines "professional services," in relevant part, as:

> [T]he solicitation, sale or servicing of:
>
> . . . .

b. variable annuities, flexible and scheduled premium annuities and variable life insurance;

. . . and

d. Securities (other than variable annuities, variable life insurance and mutual funds) that were authorized or approved by the Broker/Dealer subsidiary of the Sponsoring Company or that were processed through the Broker/Dealer subsidiary of the Sponsoring Company.

The policy also contains several exclusions, including Exclusion IV.W ("Exclusion W"), which states that the policy does not cover any claim:

[B]ased upon, arising out of or in any way involving any Securities (other than variable annuities, variable life insurance and mutual funds) that were not authorized or approved by the Broker/Dealer subsidiary of the Sponsoring Company or Securities that were not processed through the Broker/Dealer subsidiary of the Sponsoring Company.

Behrens argues that his conduct in selling the promissory notes at issue was arguably professional services, because the notes may fairly be characterized as "scheduled premium annuities." He cites the SEC complaint, which alleges that Behrens "offered and sold Notes to investors promising a rate of approximately 9% interest per annum," and that he "represented to investors that National was an investment opportunity for them to receive *regular, monthly income*." App. 40, 42 (emphasis added). Because "'annuity' is a purely generic term which refers to the method of payment and not to the underlying nature of the asset," *Eilbert v. Pelican (In re Eilbert)*, 162 F.3d 523, 526 (8th Cir. 1998) (internal quotation omitted), and has been defined as a contract "under which the purchaser makes one or more premium payments to the issuer in exchange for a series of payments, which continue either for a fixed period or for the life of the purchaser or a designated beneficiary," *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 254 (1995),

Behrens says that his alleged promises to make regular payments to investors amounted to offers to sell "scheduled premium annuities."

We need not resolve whether Behrens arguably performed professional services on that theory, because Exclusion W applies to any loss suffered by Behrens from his conduct in selling the promissory notes. Behrens admits that the notes are "securities" within the meaning of the policy, and even if they might be viewed as scheduled premium annuities, they are not variable annuities, variable life insurance, or mutual funds. As such, a claim based on the sale of the promissory notes is excluded from coverage by Exclusion W if the securities were not authorized by, approved by, or processed through Sunset.

The record demonstrates that the securities at issue were not arguably authorized or approved by Sunset, or processed through Sunset. Although an allegation in the SEC complaint avers that Behrens solicited investors from a firm that he operated as a branch office of Sunset, the complaint further alleges that the notes were actually sold through a separate entity, National, that was not affiliated with Sunset. The complaint also includes allegations that Behrens appeared to be the only person who controlled National, and that Sunset terminated Behrens when compliance officials learned of his activities with National. If Behrens sold the promissory notes from an entity separate from the Sunset branch office, and Sunset terminated Behrens as soon as it learned about the notes, then it is not plausible to infer that Sunset authorized, approved, or processed the sale of those securities. Behrens points to no other facts ascertainable by Arch that would defeat application of the exclusion. Therefore, Behrens's claim is firmly within the scope of Exclusion W, and Arch had no duty to defend.

\*       \*       \*

For the foregoing reasons, the judgment of the district court is affirmed.
_____